PARSONSON *v.* CONSTRUCTION EQUIPMENT COMPANY

OPINION OF THE COURT

1. PRODUCTS LIABILITY—SELLER—MANUFACTURER—WARRANTY—NEGLIGENCE—GASOLINE—LATENT DEFECT—PATENT DANGER.

Evidentiary facts disclosed defeated recovery as a matter of law where defendants, a seller and a manufacturer, were guilty of no breach of warranty or actionable negligence as charged and there was no latent or concealed defect of design in an asphalt manufacturing plant as the danger of fire or explosion by the careless use of gasoline was visible and patent rather than concealed or latent where a plaintiff was injured when he removed a cap from a gasoline tank on a running engine, which was a part of the plant, and a shower of gasoline and gasoline vapors emerged which then ignited.

2. NEGLIGENCE—GASOLINE—ENGINES.

Every adult person having a reasonable measure of intelligence knows better than to open a partly-filled gasoline tank for checking or filling when there is some or any nearby source of ignition and assuredly this is true when the opening is within inches of an already heated and continuously-running gasoline engine.

3. AUTOMOBILES—GASOLINE—FLAMMABLE LIQUIDS REGULATIONS.

Filling or pouring gasoline into the gas tank of a motor vehicle when its motor is running has been outlawed (1955 AACS, R 28.702).

---

REFERENCES FOR POINTS IN HEADNOTES

[1] 46 Am Jur, Sales § 799 *et seq.*
[2] 57 Am Jur, Negligence § 288 *et seq.*
[3] 57 Am Jur, Negligence § 293.
[4] 46 Am Jur, Sales § 804.
[5, 6, 8] 30 Am Jur 2d, Evidence § 1081.
[6–8] 30 Am Jur 2d, Evidence § 1081.
    57 Am Jur 2d, Negligence § 139 *et seq.*
[7] 57 Am Jur 2d, Negligence § 139 *et seq.*
[9] 57 Am Jur 2d, Negligence § 428.

4. Products Liability—Manufacturers—Product Design—Warranty—Improper Use of Product.

> Manufacturers do not have to design their products so as to warrant freedom from injury or damage to and for the foolhardy, the careless, or the habitual chance-taker, when the dangers of improper use of such products are well known to all users thereof.

5. Words and Phrases—Conjecture—Theory of Causation—Inference.

> A conjecture, as a theory of causation, is simply an explanation consistent with known facts or conditions, but not deducible from them as a reasonable inference.

6. Negligence—Proximate Cause—Conjecture.

> There may be two or more plausible explanations as to how an event happened or what produced it; yet, if the evidence is without selective application to any one of them, they remain conjectures only.

7. Negligence—Proximate Cause—Theory of Causation.

> Evidence pointing to one theory of causation, indicating a logical sequence of cause and effect, presents a judicial basis for determining causation, notwithstanding the existence of other plausible theories with or without support in the evidence.

8. Negligence—Products Liability—Theory of Causation—Conjecture.

> A submissible case of causation was not made out in a product liability case charging that the manufacturer's design created a concealed or hidden danger where the plaintiffs' burden-bearing theory of causation was comparatively improbable and no more than possible and thus was a conjecture only.

Opinion in Affirmance

Black and Adams, JJ.

9. Negligence — Contributory Negligence — Comparative Negligence — Legislature — Courts.

> *The legislature is the body best equipped to adopt a change in the rule of contributory negligence to that of pure comparative negligence rather than the Michigan Supreme Court substituting some judicially selected form of comparative negligence.*

Appeal from Court of Appeals, Division 2, Holbrook, P. J., and McGregor and Bronson, JJ., affirming Oakland, William R. Beasley, J. Submitted May 6, 1971. (No. 25 April Term 1971, Docket No. 52,572.) Decided November 9, 1971.

18 Mich App 87 affirmed.

Complaint by Robert Parsonson and Grace Parsonson against Construction Equipment Company, a partnership, its individual partners, and White Manufacturing Company for damages for personal injuries resulting from breach of an implied warranty and negligence. Verdict and judgment of no cause of action. Plaintiffs appealed to the Court of Appeals. Affirmed. Plaintiffs appeal. Affirmed.

*Charfoos & Charfoos,* for plaintiffs.

*Kelly & Tatham,* for defendant Construction Equipment Company.

*Amici Curiae:*
Association of Defense Trial Counsel (by *Hector Webber*).
Michigan Trial Lawyers Association (by *Maurice Kelman*).
Negligence Law Section, State Bar of Michigan, in opposition to comparative negligence (*Cholette, Perkins & Buchanan* [by *Edward D. Wells* and *Kenneth L. Block*]).
Negligence Law Section, State Bar of Michigan, in support of comparative negligence (by *Friedrich K. Juenger*).

Per Curiam. Prominent in the juristic area of product liability are those rules by which the courts

are called upon to ascertain the presence or absence of accountability for having manufactured a chattel which the complaining buyer or user alleges, and the defendant manufacturer or retailer denies, was *defectively designed.* Out of the great welter of professorial and judicial writing for this division of inquiry there has emerged an equally conspicuous classification of causative claims. Such claims are, in order (a) that the manufacturer's design has created a *concealed* or *hidden* danger; (b) that the manufacturer has failed to provide a needed or reasonably required *safety device,* or (c) that the manufacturer has used or employed material of *inadequate strength* or *quality* suitable for the intended use.

We are concerned in this case with (a) above. Under it liability or nonliability is properly determined by careful application to the ascertained facts of what is compendiously termed the "latent-patent" test. For recent analysis and application of that test, supported by copious references to impressive judicial authority, examine *Blankenship* v. *Morrison Machine Co.* (1969), 255 Md 241 (257 A2d 430), and *Neusus* v. *Sponholtz* (CA 7, 1966), 369 F2d 259.

*Blankenship* quotes and follows *Myers* v. *Montgomery Ward & Co., Inc.* (1969), 253 Md 282 (252 A2d 855). The quotation of *Myers* reads (p 293):

"The manufacturer of a mower is not an insurer, and is under no duty to make an accident proof product \* \* \* . No cause of action is made out in the absence of an allegation that the injury was caused by a latent defect not known to the plaintiff or a danger not obvious to him, which was attendant on proper use \* \* \* . 'There is certainly no usual duty to warn the buyer that a knife or axe will cut, a match will take fire, dynamite will explode, or a hammer will mash a finger,' \* \* \* ."

*Neusus* concludes (p 263):

"It is a truism to observe that no mechanical device can be made accident-proof. If it is misused it may cause injury, regardless of the method of manufacture. As stated by the New York Court of Appeals in *Campo* v. *Scofield,* 301 N.Y. 468, 95 N.E.2d 802, 804 (1950) [quoted with approval in *Murphy* v. *Cory Pump & Supply Co.,* 47 Ill.App.2d 382, 197 N.E.2d 849, 857 (1964)]:

"'We have not yet reached the state where a manufacturer is under the duty of making a machine accident proof or foolproof. Just as the manufacturer is under no obligation, in order to guard against injury resulting from deterioration, to furnish a machine that will not wear out * * * , so he is under no duty to guard against injury from a patent peril or from a source manifestly dangerous. * * *

"'In other words, the manufacturer is under no duty to render a machine or other article "more" safe—as long as the danger to be avoided is obvious and patent to all.'"

*First:* Was the Defect Claimed Latent or Patent?

Typical of some appeals previously submitted to this Court, and recently more and more so, this record and the briefs received disclose that counsel both at trial and on appeal have concentrated too much upon abstractive theories and selected legal writings and too little upon "the facts which generate the law".[1] This has necessitated a doubly

---

[1] "More and more we lawyers are awaking to a perception of the truth that what divides and distracts us in the solution of a legal problem is not so much uncertainty about the law as uncertainty about the facts—the facts which generate the law. Let the facts be known as they are, and the law will sprout from the seed and turn its branches toward the light. *We make our blunders from time to time as rumor has it that you make your own. The worst of them would have been escaped if the facts had been disclosed*

cautious transfer of attention from a not too helpful joint appendix to six volumes of transcript consisting of 742 typed sheets, the better to ascertain precisely the legal principle or principles that are applicable to the controlling evidentiary facts. Now for those facts.

In early 1960 one Heath of Port Huron, doing business as Heath Excavating Co., was doing small jobs of asphalt paving in conjunction with his excavating business. For that purpose he had acquired and was using "a smaller White asphalt plant". At that time he communicated to defendant White Manufacturing Co., of Elkhart, Indiana (hereafter termed "White") his interest in acquiring "a larger capacity plant".

Defendant Construction Equipment Co., of Detroit (hereafter termed "Construction"), was in business as buyer, seller and lessor of heavy construction and industrial machinery and equipment, "new and used". Alerted by White to Heath as a prospect, Construction's sales representative Higgins called on Heath and informed him that White then had, "on the drawing board", a bigger and yet fully transportable asphalt manufacturing machine known as an "L-501 asphalt plant". The two, Heath and Higgins, finally went to Elkhart to view the L-501 plans. Design changes of the proposed new model were then being made from time to time by White. White agreed to build an L-501 specially for Heath, to be sold to Construction and by Construction to Heath (for financial reasons).

Heath insisted that the plant not only must be capable of greater output but also must be thoroughly mobile so that he would be "able to move

to us before the ruling was declared." ("Selected Writings of Benjamin Nathan Cardozo", p 373; published 1947 by Fallon Law Book Co., New York).

the plant day to day, week to week" for the handling of extended paving jobs as well as small ones.[2] Heath also insisted that gasoline engines be installed for necessary power, rather than electric motors or diesel oil-fired engines. He was given a choice of all three methods of providing power, but chose gasoline power over electric power, partly on account of nonavailability of electric power connections for most jobs, and partly on account of the extra cost of a transportable electric generating plant. He rejected diesel power, it having been found that diesel engines would cost much more than gasoline engines. Made as it was to Heath's specifications and fitted to his financial ability, the parties agree that the plant thus built for him was the only one of its specific kind that was manufactured by White.

The agreed sale to Construction was completed and reduced to writing by Construction's purchase order dated March 23, 1960. Addressed to White, it described the purchase as a "Model 501 B Asphalt Plant with Dust Collector System". It specified a sale price of $33,400 ("Less 15% Disc."), "Customer Pickup" as to shipment, and a delivery date of May 15, 1960. These provisions were included:

"Price subject to additions per customer's specifications.

"This purchase order subject to final approval of specifications by customer."

---

[2] Ready movability of the especially-designed asphalt plant was stressed throughout the negotiations. That accounted for its design with a steel towing tongue and its own wheels for highway transport. See plaintiffs' exhibits 1 and 2, shown *post* at pp 81, 82, portraying the forepart of the chassis of the plant, the tongue, the partly-perforated metal enclosure in which the gasoline engine and gas tank in scrutiny were housed, and the relation of the latter to the horizontal heater-blower and drying chamber depicted above and aft the engine.

It is agreed that "customer" meant Mr. Heath. The plant was hauled by Heath from Elkhart to Port Huron and put to use after White's men, having come to Port Huron two or three times for the purpose, checked and adjusted the machinery of the plant for operation and drove it through what Mr. Higgins described as a "dry run".

A year and a half later the plant was "repossessed" by Construction. "Partly dismantled", the plant and its parts were transported by Construction from Port Huron to its yard on West Eight Mile Road. There the plant remained unused until it was sold by Construction to a corporation formed in February of 1963. The shareholders of the buying corporation consisted of plaintiff Robert Parsonson, his brother Alfred Parsonson, Andy Hornak, George Hornak, and Robert Huhn. The corporation was named H. & L. Paving, Inc.

The parties agree that H. & L. Paving bought the plant "as is, where is" from Construction. The sale was made April 16, 1963. Construction towed the chassis to H. & L. Paving's yard on Schultes Street. H. & L. Paving trucked the separate parts to the Schultes Street yard. There H. & L. Paving put the plant together, the process taking some two weeks. After that was done H. & L. Paving evidently sent for Mr. White, president of defendant White,[3] for he came to the Schultes Street yard for operational advices. The extent of those advices was given by Alfred Parsonson:

"*Q*. After it was erected, were you present when Mr. White came upon the premises?

"*A*. Yes.

"*Q*. Would you tell us what you did, if anything, with Mr. White on that day?

_____
[3] Mr. White died prior to the trial.

"*A.* I don't recall how many of us there were but we followed Mr. White around as he explained the operation of the plant to us. I clearly recall him showing us how to set the burner, how to adjust the air on it. I can remember him showing us how to operate the pug mill, and I can remember him correcting a fault we made in the hookup of the asphalt and I can remember him suggesting that we get a smaller motor to heat the asphalt pump. Oh, yes, and he told me to make sure—

"*Q.* Don't tell us what he told you, just what he did.

"*A.* That I grease the thing every day.

\*    \*    \*

"*Q.* Did you have to follow any particular procedure to close the plant down?

"*A.* Yes. We had set up a procedure for ourselves. First of all, we would shut the gates on the storage bin, allow all the aggregate to work its way out, then turn off the burner. This then would stop the flow of the aggregate. The aggregate would have gone up to here. We then could turn this off, turn this dryer off, the blower off. We could go over, drain the asphalt circuit, which if we left the asphalt in there it would harden, then we would come back and turn this one off.

"*Q.* Why did you wait for the last one for the Continental motor?

"*A.* The reason we would leave this to last, Mr. White had recommended we do this to make sure we would get no warpage in the dryer barrel.

"*Q.* What do you mean by that?

"*A.* Well, he said that if we didn't, if we stopped it—I don't know really, I don't know.

"*Q.* Tell us what he said.

"*A.* All he told us is to make sure we allowed this to run a few minutes after the heat was off so we wouldn't get warpage in the dryer. How this would come about, I don't know.

"*Q.* So, in other words, when you say run, this dryer turns?

"*A.* Right.

"*Q.* And you had to leave the motor on to keep it turning?

"*A.* That is correct.

"*Q.* Did you know any of this before you got this plant?

"*A.* No, I didn't.

"*Q.* Did you know anything about asphalt plants before you got this plant?

"*A.* No, I didn't.

"*Q.* Who showed you or taught you how to operate this plant?

"*A.* Mr. White was my greatest source of information.

"*Q.* When he came.

"*A.* To visit us, yes."

H. & L. Paving started job-production with the plant in May of 1963. June 1, H. & L. Paving broke up by agreement. The result was transfer of ownership of the plant to the Parsonson brothers and Mr. Huhn, as copartners d/b/a Capital Asphalt. The three continued steady use of the plant for production of asphalt from June 1 to October 23, 1963, when plaintiff Robert Parsonson's presently-viewed accident was suffered.

Mr. Huhn took no part in the operation of the plant. The operational practice of the brother partners was that Alfred Parsonson manipulated the controls at the position thereof, with plaintiff Robert Parsonson maintaining the books of the partnership and, pertinent here during each operational day, keeping the gas tanks of all five gasoline engines of the plant checked and filled as needed with gasoline.

This case concerns one only of the five gasoline engines with which the plant was equipped. Exhibit

1 shows the forward or tongue-towing end of the plant, most of the chassis on which the plant was mounted, the position on the chassis just aft the tongue of the Continental gasoline engine in question (lower center foreground), and the forward or blower end of the long horizontal asphalt heating chamber which is aft of and above the engine. Exhibit 2 portrays in closeup what is claimed and denied to be an actionable defect of design, that is, the installation of a standard gasoline engine and its built-in gasoline tank within six to seven feet below and forward of the air intake of the gun-type heater-blower of the long horizontal asphalt heater-dryer.

This brings up need for a specific description of the six-cylinder gasoline engine assembly shown in the central foreground of exhibits 1 and 2. It was established that some 500,000 of the pictured model had been manufactured by Continental Motors Corporation as power for stationary machinery, "off the road equipment, not highway equipment", and that many had been supplied to the military establishment. The unit included a standard water-cooled radiator and a cooling fan immediately behind the radiator; the radiator being vertically even with the forward end of the chassis. The gasoline tank formed the top of the unit. The engine drove directly the straightaway power shaft which extends aft from its rear.

Manufacturer Continental provided a "vent hole" in the *side* of the *filler neck* of the tank, rather than an *auto-type vented cap*. One of its designing engineers testified without dispute that "it was deliberately designed that way so that we could use the same cap for both the radiator and for the gasoline tank". He went on to testify that if one should use a *vented cap* for the gasoline tank the neck-vent of

the tank could not fulfil its purpose, and that "The primary reason for venting is to maintain atmospheric pressure on the top of the gasoline in the tank".

October 23, 1963, was a typical day of full production for Capital Asphalt. Alfred Parsonson was operating the plant at his position. Plaintiff Robert Parsonson was tending to the gas tanks. It was standard practice of the brothers to check and fill the gasoline tank of the engine portrayed by exhibit 2, *without first having stopped the heater-blower or having stopped the engine.* The explanation given for such practice was that it would take too long to shut off and reheat, with "trucks arriving for loads", to which this was added:

"*Q.* Couldn't you just turn it off for a second when you filled this gas engine?

"*A.* No, sir.

"*Q.* Why not?

"*A.* Because you have to have this aggregate drying at a temperature of up to 325 degrees Fahrenheit, and if you turn this off, well, then, you are not getting your heat into your aggregate.

"*Q.* How would that affect your over-all operation?

"*A.* Well, it would affect it. It would turn out a bad product.

"*Q.* As a matter of fact, did it occur to you to turn that burner off each time you checked that gas tank?

"*A.* No, sir."

Operating the plant in such manner, the two brothers had experienced no trouble with it throughout the operational period June 1 through October 23; "nothing unusual" until October 23. Plaintiff Robert Parsonson checked the amount of gasoline in each engine's gas tank some six to eight times per

full day of production and filled each tank an average of two to three times during such day. The checking of level was done by removing the gas tank cap from the top of the motor assembly and by inserting a stick vertically in the tank through the filler-opening. Filling of each tank as needed was done occasionally by plaintiff Robert Parsonson with a five-gallon gasoline can, but usually by means of a hose held in the tank by him which extended from a portable 220-gallon supply tank, from which Alfred Parsonson pumped gasoline by hand.

About three in the afternoon of October 23 plaintff Robert Parsonson checked the level of the belt-driving engine which appears in the lower left foreground of exhibit 1.[4] Then he walked around the tongue and jumped up on the platform of the chassis, preparatory to checking the level of the gasoline in the tank of the engine in question. The metal sides of the motor assembly had been removed, thereby exposing the heated engine and its dangers of ignition to the shower of gasoline and vapors of gasoline that ensued. The blower and engine were running steadily, as they had been for hours.

Plaintiff Robert Parsonson stood behind the engine, near the middle of the chassis and facing its right side (as if facing the camera in exhibit 2, from behind the engine), with his back to the ladder-stairway shown by both of the exhibits. Having picked up the measuring stick, he started to and did remove the gas tank cap. As he did so built-up pressure inside the tank blew, upward, a shower of gasoline as well as gasoline vapors. The pressure was such that

---

[4] This gasoline engine, unlike the Continental gasoline engines with which the plant was equipped, was air-cooled rather than radiator cooled. It was referred to in the testimony as the "Wisconsin engine" and, of course, had its own gasoline tank atop the unit. Whether the Wisconsin gas tank cap differed or did not differ from the Continental gas tank caps is not answered by the record.

plaintiff Robert Parsonson was "drenched" with gasoline. Asked if he could feel some "liquid" gasoline, plaintiff Robert Parsonson replied that he could "feel the wetness as it came down". He immediately attempted to turn the cap back on. Then some source ignited the gasoline and vapors. To employ plaintiff Robert Parsonson's words, "Then all of a sudden there was a burst of flame which came up here somewhere in front of me".[5]

The temperature that day stood at about 80 degrees. The wind was blowing across the chassis from its left side to its right side, rather than from fore to aft as plaintiffs' expert had been mistakenly informed. The immediate or efficient cause of the accident had to be, as the experts all agreed, a "clogged" vent of the gasoline tank. There was no other reason for the built-up pressure inside the tank, it having been pointed out in various ways that a tightly closed gasoline tank, partly filled with gasoline, will so heat up in hot sun as to raise considerable pressure inside.

The evidentiary facts disclosed here defeat recovery as a matter of law. The jury found the defendants guilty of no breach of warranty or actionable negligence as charged.[6] We in turn, exercising our function, find the defendants would have been entitled to judgment, on defendants' motion as made, had the jury *not* found in their favor.

---

[5] "Somewhere in front of me" was *not* the direction from plaintiff Robert Parsonson of the heater-blower. The "burst of flame" thus described must have come from the side of the engine closest to the exhibit 2 camera. See discussion, *post*, of the issue of causation.

[6] The verdict:

"*The Clerk:* Would the foreman please rise?

"Members of the jury, have you agreed upon a verdict? If so, let your foreman speak.

"*Juror No. 1:* Yes, we have.

"*The Clerk:* What is that verdict?

"*Juror No. 1:* Well, we have found in favor of the defendants, on both defendants on both conditions, that is, the breach of implied warranty and negligence, also."

There was no latent or concealed defect of design as charged. While it would have made no difference legally, there is a significant absence of claim here that either the *defendant manufacturer* or the *defendant seller* told the plaintiffs or anyone in their behalf that the plant could or should be continued in full operation while one of its gasoline tanks was due for checking and filling. Every adult person having a reasonable measure of intelligence, such as each of the Parsonson brothers exhibited while on the stand, knows better than to open a partly-filled gasoline tank for checking or filling when there is some or any nearby source of ignition. Assuredly is this true when the opening is within inches of an already heated and continuously-running gasoline engine. Even as to the filling or pouring of gasoline into the gas tank of a motor vehicle when its motor is running, that practice has been outlawed by and since the effective date of Flammable Liquids Rule 102 (1955 AACS, R 28.702, p 41):

"Operation of dispensing equipment.

\*     \*     \*

"(b) The fuel tank of motor vehicles shall not be filled until the vehicle's motor has been shut off."[7]

Here the brothers Parsonson practiced a daily risk; that of regular checking and filling of a gasoline tank immediately above an hour after hour laboring engine with its hot parts as well as its spark plugs exposed, all being causally suited for disaster whenever, with or without pressure inside the tank, gasoline might be spilled while one was in the act of filling the tank.

---

[7] For the current rule, see the Flammable Liquids Regulations of the Fire Marshal Division of the Michigan State Police, issued in 1963 pursuant to sections 3, 5 and 5A of PA 1941, No 207, as amended. The rule appears at page 80 of the 1963 regulations.

A reasonable measure of research outside the briefs discloses that which is reasonably expectable, that is to say, no court thus far has held that manufacturers must so design their products as to warrant freedom from injury or damage to and for the foolhardy, the careless, or the habitual chance-taker, when the dangers of improper use of such products are known well to all users thereof. Here the danger of fire or explosion by the careless use of gasoline was visible and patent rather than concealed or latent. That the brothers got away with such rash disregard of peril, and suffered nothing untoward or injurious for at least four months of steady operation, is not far short of miraculous. The inevitable ultimately occurred; the only permissible inference being that the built-in vent of the gasoline tank somehow became blocked that day or the day before, leaving only the all-day heat of the sun added to the natural heat of the engine below to combine with Robert Parsonson's negligence in making up the proximate cause of his misfortune.

*Second:* WAS A SUBMISSIBLE CASE OF CAUSATION MADE OUT, AS CHARGED?

In *Kaminski* v. *Grand Trunk W. R. Co.* (1956), 347 Mich 417, 422, this Court adopted the following test-definition of what is causally conjectural and what is not for cases as at bar:

" 'As a theory of causation, a conjecture is simply an explanation consistent with known facts or conditions, but not deducible from them as a reasonable inference. There may be 2 or more plausible explanations as to how an event happened or what produced it; yet, if the evidence is without selective application to any 1 of them, they remain conjectures only. On the other hand, if there is evidence which points to any 1 theory of causation, indicating a logical sequence of cause and effect, then there is

a juridical basis for such a determination, notwithstanding the existence of other plausible theories with or without support in the evidence.' ''

Plaintiffs' theory of causation is that ignition came from the fully-operating heater-blower. Defendants' theory is that ignition came from some other source, suggested as being a live cigarette in plaintiff Robert Parsonson's mouth or hand, a spark from the muffler or other heated part of the engine or from the engine proper, notably from its exposed spark plugs.

Applying *Kaminski's* test to these conflicting theories of causation, and keeping in mind that plaintiffs bear the burden of proof, not only of defective design but of proximate causation attributable to such alleged defective design, we perceive no contest.

The day was unusually hot. So must have been the continuously-driven engine, the brothers having taken off the removable sides for additional cooling with resultant exposure of all of its potential sources of ignition. An 8-1/2 to 10 mile wind was blowing from behind plaintiff Robert Parsonson as he stood on the platform of the plant, with his back toward the upgoing ladder-stairs. In view of his height and the much lower level of the top of the engine's gas tank, his body must have been partly bent over the tank, thereby shielding to some extent the heater-blower from the ultimately-spewing gasoline and directing it more over the running engine. The engine as a potential source of ignition was much nearer to the pressured release of gasoline than was any part of the heater-blower. There was no proof of fire damage to or around the forward end of the heater-blower, or scorching of any of its parts.

No one of plaintiffs' witnesses, experts and all, bothered during their investigation of the plant to

check the gas tank cap of the engine, for proper fit or venting or for any other purpose. Indeed, their testimony fairly discloses they did not care so to do. Further, and although it was in their possession from the time of the fire, the Parsonson brothers failed without proffered explanation to produce the particular gas tank cap that was in use on October 23. That cap, viewing all of the evidence, doubtless would have told directly rather than inferentially the immediate cause of this first-time built-up pressure inside the gas tank. During the even sun-hotter months of June through September, the two brothers checked and filled the gas tanks of all the gasoline engines without resultant difficulty, suggesting that the "clogging" of the vent of the tank necessarily took place overnight before or during the day of the accident. Finally, there was an appreciable interval between plaintiff Robert Parsonson's unscrewing of the gas tank cap and the ignition to which he testified, during which interval he tried to screw the cap back into place. Then, when ignition came, the "burst of flame" came up "somewhere in front of me"; not to his right or above and behind him.

The most likely inference is that ignition came when the vapors and droplets of gasoline descended around the heated and running engine as, meanwhile, some of those vapors were sucked into and over the heated engine by its cooling fan. Adding all this proof of facts, the best that may be said for plaintiffs' theory of causation, according it the most favorable construction such proof will permit, is that that theory remains without selective application of the heater-blower as a source of ignition over the more probable and much nearer source, that is, the steadily-running engine immediately below the opening from whence came the gasoline that burned the

injured plaintiff. In sum, we determine upon undisputed facts the legal reverse—as between plaintiffs and defendants—of our ruling in *Kaminski.* There at p 427 we found the "comparative improbability" of the *defendants'* theory of conjecture, summarizing that it was "possible but unlikely". Here the *plaintiffs'* burden-bearing theory of causation is comparatively improbable and no more than possible. Thus it is a conjecture only, within *Kaminski's* adopted rule.

As noted by Division 2 (*Parsonson* v. *Construction Equipment Company* [1969], 18 Mich App 87, 88, 89), plaintiffs have raised a number of additional questions for review. All however proceed on assumption that errors were committed during the trial of a submissible case, warranting a new trial. In view of the foregoing, however, there is no need for treatment of any of those questions.

Affirmed. In view of the nature of the case and our primary reason for grant of review, namely, consideration of the comparative negligence proposal, no costs will be awarded.

T. M. KAVANAGH, C. J., and BLACK, ADAMS, T. E. BRENNAN, T. G. KAVANAGH, SWAINSON, and WILLIAMS, JJ., concurred.

BLACK, J. (*concurring in affirmance*). As noted by Division 2 (*Parsonson* v. *Construction Equipment Company* [1969], 18 Mich App 87, 88, 89), plaintiffs have raised a number of additional questions for review. All however proceed on assumption that errors were committed during the trial of a submissible case, warranting a new trial. In view of the foregoing, however, there is no need for treatment of any of those questions beyond brief reference to the thoroughly briefed proposal that this

Court employ the case at bar as a vehicle for overrulement of contributory negligence, and that the Court should substitute in the place thereof some judicially selected form of comparative negligence.[1]

The most prominent reason assigned for this latest proposal of judicial legislation was presented brilliantly during oral argument of plaintiffs' appeal. It was that contributory negligence is most unfair to plaintiffs in negligence in that it authorizes jury argument and jury instruction that, if any contributory negligence, "however slight", be found, the verdict must be against the slightly negligent plaintiff regardless of the extent or nature of the defendant's causal negligence.

I could agree with the stated "however slight" criticism if it were not for *Clark* v. *Grand Trunk W. R. Co.* (1962), 367 Mich 396, 402, and *Mack* v. *Precast Industries, Inc.* (1963), 369 Mich 439, 448–454.[2] But the point is now academic in view of *Mack*. It is not likely that this Court will undertake to reverse *Mack's* holding that these "however slight" jury arguments and instructions are quite out of order.

As for the motion for legislation proper, I agree with the conclusion reached by the Supreme Court of Wisconsin in the *Vincent* case (p 130):

"Without passing judgment upon the merits of pure comparative negligence as opposed to comparative negligence as it is presently applied in this jurisdiction, we think that the legislature is the body best

---

[1] Last year a near similar proposal by the American Trial Lawyers Association, that "pure" comparative negligence be installed in Wisconsin by judicial action, was submitted to and rejected by the Supreme Court of that State. See *Vincent* v. *Pabst Brewing Co.* (1970), 47 Wis 2d 120 (177 NW2d 513).

[2] For similar sentiments, see recent *O'Brien* v. *Bethlehem Steel Corp* (1971), 59 NJ 114; 279 A2d 827.

equipped to adopt the change advocated by the appellant. Such was also the decision of the Illinois Supreme Court in *Maki* v. *Frelk* (1968), 40 Ill 2d 193 (239 NE2d 445) when it was asked to adopt for general application the doctrine of comparative negligence."