OWENS v ALLIS-CHALMERS CORPORATION

Docket No. 31521. Submitted January 3, 1978, at Detroit.—Decided
    May 8, 1978. Leave to appeal applied for.

Sallie M. Owens, administratrix of the estate of Dan Owens, Jr.,
    deceased, brought an action against the Allis-Chalmers Corpo-
    ration on a theory of products liability seeking to recover for
    the death of her husband, who was killed when a forklift
    manufactured by the defendant overturned. The Wayne Circuit
    Court, Horace W. Gilmore, J., granted the defendant's motion
    for a directed verdict at the conclusion of the plaintiff's proofs
    and a judgment for defendant was entered. Plaintiff appeals.
    *Held:*

    1. Manufacturers have a duty to provide adequate warnings
    to potential users of their products of the latent risks of injury
    created by their selection of product design. The adequacy of
    the warning under the particular circumstances of a given case
    is a question for resolution by the trier of fact.

    2. Evidence of the following must be presented for a plaintiff
    to establish a question of fact as to a manufacturer's breach of
    duty in design defect products liability litigation: (1) that the
    particular design was not in conformity with industry design
    standards, design guidelines established by an authoritative
    voluntary association, or design criteria set by legislative or
    other governmental regulation; or (2) that the design choice of
    the manufacturer carries with it a latent risk of injury and the

REFERENCES FOR POINTS IN HEADNOTES
[1] 63 Am Jur 2d, Products Liability § 206.
[2, 7] 63 Am Jur 2d, Products Liability §§ 28, 63.
    Manufacturer's or seller's duty as to product design as affecting his
        liability for product-caused injury. 76 ALR2d 91.
[3] 63 Am Jur 2d, Products Liability § 53.
    Manufacturer's or seller's duty to give warning regarding product
        as affecting his liability for product-caused injury. 76 ALR2d 9.
[4] 63 Am Jur 2d, Products Liability §§ 71–73.
[5] 5 Am Jur 2d, Appeal and Error § 886.
[6] 5 Am Jur 2d, Appeal and Error § 849.
[7] 63 Am Jur 2d, Products Liability § 71.

manufacturer has not adequately communicated the nature of that risk to potential users of the product.

3. The trial court's directed verdict was proper since the evidence presented by the plaintiff raised neither a question of design conformity with established standards nor a risk of injury that would not be readily perceived by the plaintiff's decedent, an experienced forklift operator.

Affirmed.

N. J. KAUFMAN, J., concurred, holding a product liability suit based on an implied warranty theory requires proof of a defect in manufacturing or design and injury caused by or resulting from the defect; under this theory a defect is established by proof that the product is not reasonably fit for its intended, anticipated or reasonably foreseeable use.

### OPINION OF THE COURT

1. ACTION—TORTS—PRODUCTS LIABILITY—CAUSE OF ACTION—ELEMENTS—STRICT LIABILITY—BREACH OF WARRANTY.

The requisite elements for a cause of action for products liability based upon strict liability in tort are congruent to those for breach of warranty.

2. MANUFACTURES—PRODUCTS LIABILITY—MECHANICAL DEVICES—INJURIES—DEFECTS IN MACHINE.

Manufacturers are not required to make mechanical devices accident proof; the fact that an injury results from the use of a machine does not ipso facto mean that the machine is defective.

3. PRODUCTS LIABILITY—MANUFACTURES—LATENT RISKS—WARNINGS—ADEQUACY—PRODUCT DESIGN.

Manufacturers have a duty to provide adequate warnings to potential users of their products of the latent risks of injury created by their selection of product design; the adequacy of the warning under the particular circumstances of a given case is a question for resolution by the trier of fact.

4. PRODUCTS LIABILITY—EVIDENCE—QUESTIONS OF FACT—DESIGN DEFECTS—BREACH OF DUTY.

Evidence of the following must be presented for a plaintiff to establish a question of fact as to a manufacturer's breach of duty in a design defect products liability litigation: (1) that the particular design was not in conformity with industry design standards, design guidelines established by an authoritative voluntary association, or design criteria set by legislative or other governmental regulation; or (2) that the design choice of

the manufacturer carries with it a latent risk of injury and the manufacturer has not adequately communicated the nature of that risk to potential users of the product.

5. APPEAL AND ERROR—MOTIONS—DIRECTED VERDICT—EVIDENCE—LIGHT MOST FAVORABLE TO NONMOVING PARTY.

The Court of Appeals in reviewing a trial court's grant of a motion for a directed verdict should consider the evidence presented in a light most favorable to the nonmoving party.

6. PRODUCTS LIABILITY—DIRECTED VERDICT—DESIGN DEFECTS—APPEAL AND ERROR.

A trial court's directed verdict in favor of the defendant in a product liability action based on an alleged design defect in a forklift was proper where the evidence presented by the plaintiff raised neither a question of design conformity with established standards nor a risk of injury that would not be readily perceived by the plaintiff's decedent, an experienced forklift operator.

CONCURRENCE BY N. J. KAUFMAN, J.

7. PRODUCTS LIABILITY—IMPLIED WARRANTY—PROOF OF DEFECTS—INJURY.

*A product liability suit based on an implied warranty theory requires proof of a defect in manufacturing or design and injury caused by or resulting from the defect; a defect is established under this theory by proof that the product is not reasonably fit for its intended, anticipated or reasonably foreseeable use.*

*Hurwitz & Karp,* for plaintiff.

*Garan, Lucow, Miller, Lehman, Seward & Cooper (Gromek & Bendure,* of counsel), for defendant.

Before: BASHARA, P. J., and J. H. GILLIS and N. J. KAUFMAN, JJ.

BASHARA, P. J. This is an appeal by plaintiff from a directed verdict granted to defendant at the conclusion of plaintiff's proofs. On a theory of products liability, plaintiff sought recovery for the

death of her husband, who was killed when the forklift truck he was operating for his employer overturned, crushing his skull with the overhead, protective guard.

No one witnessed the occurrence. Decedent reported to his job and was instructed to drive a forklift to another plant on his employer's property. Moments after he left, other employees, in route over the same roadway to the same location, discovered decedent pinned under the overhead guard of the forklift. As it then appeared, the forklift had traveled off the roadway, struck a concrete-filled post, and turned over onto its side.

The forklift was manufactured by defendant and sold with other forklift vehicles to the decedent's employer by one of defendant's dealers. Plaintiff alleged that defendant was negligent in the design of the forklift, that the defective design constituted a breach of warranty, and that defendant was liable under the doctrine of strict liability in tort. Design defect allegations were predicated principally upon the absence of driver restraints on the vehicle, such as seat belts or a protective enclosure.

At trial, plaintiff's expert witness testified at length about the inadequacy of the static stability tests utilized by the forklift manufacturers generally. His opinion was that dynamic stability tests were essential to ascertain the true handling characteristics of forklift vehicles so that proper design technology could be developed.

He also testified as to the risks of injury created by the absence of some driver restraint apparatus in forklifts equipped with an overhead guard. He opined that, given the unstable handling qualities of a forklift and the concomitant high probability of rollovers, some form of driver restraint system

was necessary for a properly designed forklift. Notably, on cross-examination, the expert witness was unable to specify any industry standard, legislative enactment, or government regulation requiring the installation of a driver restraint device on forklifts or establishing dynamic stability testing requirements.

The trial court concluded there was no evidence to show that defendant was negligent in failing to adhere to some standard for testing or designing its forklifts. Further, the trial court found the evidence presented did not establish that any defect in the forklift was causally related to the decedent's death.

Plaintiff claims that the question of whether the forklift was defectively designed should have been submitted to the jury. She urges that the expert testimony, stating that a driver restraint device would have prevented the decedent's death, is itself sufficient to raise a question of fact as to the defective design.

Our discussion of this case may be narrowed by making a number of observations. This Court has recognized that the requisite elements for a cause of action based upon strict liability in tort are congruent to those for breach of warranty. *Williams v The Detroit Edison Co,* 63 Mich App 559, 567; 234 NW2d 702, 707 (1975), *lv den* 395 Mich 800 (1975). See also *Johnson v Chrysler Corp,* 74 Mich App 532, 535–536; 254 NW2d 569, 571–572 (1977), *lv den* 400 Mich 861 (1977). Therefore, the strict liability count is a mere redundancy, since recovery is equally available by the action for breach of warranty.

Further, we have carefully reviewed the evidence presented by plaintiff on the claim of negligence and defective design, especially the exten-

sive testimony of plaintiff's expert witness. That evidence showed that forklifts are, by their nature, unstable vehicles. There is nothing to show how the vehicles' stability may be enhanced, given the design characteristics mandated by the vehicles' intended uses. Merely because an injury results from the use of a machine does not ipso facto mean that the machine is defective. Manufacturers are not required to make mechanical devices "accident-proof". *Parsonson v Construction Equipment Co,* 386 Mich 61, 64–65; 191 NW2d 465, 466 (1971).

At the commencement of this discussion, we deem it important to emphasize that this litigation does not involve a claim that the fatal injury resulted from some machine part that malfunctioned as a result of a defect in its manufacture. The responsibility of the trier of fact for finding a defect and injury causation as a matter of fact is well-established in that context. *Caldwell v Fox,* 394 Mich 401; 231 NW2d 46 (1975). See also *Kupkowski v Avis Ford, Inc,* 395 Mich 155; 235 NW2d 324 (1975).

When courts are confronted with claims of product design defects, there is a geometric increase in the complexity of the issues. Product design choices are multi-faceted, or as one legal writer has termed it, polycentric.[1] That is, design choices involve such considerations as the intended use and utility of the product, cost constraints dictated by the marketplace and the manufacturer's competitive position, safety standards established by the industry or government regulation and the

[1] *See* Henderson, *Judicial Review of Manufacturers' Conscious Design Choices: The Limits of Adjudication,* 73 Colum L Rev 1531 (1973), Henderson, *Design Defect Litigation Revisited,* 61 Cornell L Rev 541 (1976), Henderson, *Expanding the Negligence Concept: Retreat from the Rule of Law,* 51 Ind L J 467 (1976).

feasibility of alternative designs, to name only a few.[2] To the extent that another coordinate branch of government has not determined the degree to which public policy shall govern design choices, the task devolves upon the judiciary.

Considering the nature of the design process, we find that adjudication must necessarily play a limited role in setting design standards. Without some extrajudicially established guidelines, the adjudicatory standard-setting process would resort to an assessment of conflicting expert testimony by those not possessed of the requisite expertise to adequately evaluate the interrelated and interdependent design choice criteria. Additionally, this evaluation would be made within an atmosphere susceptible to influence by sympathy for an injured plaintiff, instead of an abstract concern for the desirable effect that public policy should play in governing a manufacturer's design choices. Inevitably, this would lead to varying standards from jury to jury or trial court to trial court.[3]

We are merely recognizing from the foregoing considerations that triers of fact are not formulators of public policy and that trial courts are inappropriate for the task in the area of product design choices.[4] This is not to say that plaintiffs

---

[2] The role of the adjudication process, as it pertains to affecting the design choices of manufacturers, is perceptively explicated in Henderson, *Judicial Review of Manufacturers' Conscious Design Choices: The Limits of Adjudication,* 73 Colum L Rev 1531 (1973).

[3] Henderson, *supra* n 2, at 1558. While Professor Henderson's thesis has its opponents, none have analyzed the problem as perceptively, and Professor Henderson has been quick to provide a persuasive response to the more cogent criticisms of his position. *Compare* Twerski, Weinstein, Donaher & Piehler, *The Use and Abuse of Warnings in Products Liability-Design Defect Litigation Comes of Age,* 61 Cornell L Rev 495 (1976), with Henderson, *Design Defect Litigation Revisited,* 61 Cornell L Rev 541 (1976).

[4] The problem presented in design defect cases where extrajudicial standards are absent may be analogized to ascertaining what Justice LEVIN has referred to as the "general standard of care". *Moning v*

have no means by which they can seek recovery
for injuries resulting from the conscious design
choices of manufacturers where extrajudicial de-
sign guidelines are absent.

There remains a duty of manufacturers to pro-
vide adequate warnings to potential users of their
products of the latent risks of injury created by
their selection of product design. See *Comstock v
General Motors Corp,* 358 Mich 163; 99 NW2d 627
(1959). The adequacy of the warning under the
particular circumstances of a given case, is a
question for resolution by the trier of fact. *Id.*

Consequently, we conclude that for a plaintiff to
establish a question of fact as to a manufacturer's
breach of duty in design defect products liability
litigation, evidence of the following must be pre-
sented:[5]

(1) That the particular design was not in conformity
with industry design standards, design guidelines estab-
lished by an authoritative voluntary association, *or*
design criteria set by legislative or other governmental
regulation; *or*

(2) That the design choice of the manufacturer carries
with it a *latent* risk of injury *and* the manufacturer has
*not* adequately communicated the nature of that risk to
potential users of the product.

---

*Alfono,* 400 Mich 425; 254 NW2d 759 (1977). A divergence from the
ordinary negligence case occurs, because the term "reasonable care",
in the context of design defect litigation, is dependent upon determi-
nants entailing complex technology and economic market structure.
Absent extrajudicial guidelines, there remains no foundation from
which a general standard of care can be ascertained. The establish-
ment of such standards where the void exists is more ideally suited to
the functions of the two other branches of government. *See* Hender-
son, *Judicial Review of Manufacturers' Conscious Design Choices: The
Limits of Adjudication,* 73 Colum L Rev 1531, 1569–77 (1973).

[5] These principles, while delimiting the extent of a manufacturer's
liability for conscious design choices, are *not* mutually exclusive.
Either one or both may be shown by the evidence, and the existence
of either one or both, in conjunction with the requisite showing of
injury causation, will establish liability.

In determining the propriety of the directed verdict in this case, we must review the evidence presented in a light most favorable to the plaintiff. *Caldwell v Fox,* 394 Mich 401, 407; 231 NW2d 46, 49 (1975). From our review of the plaintiff's evidence, we conclude that no question was raised as to any fact that would impose liability upon defendant. The evidence raised neither a question of design conformity with established standards nor a risk of injury that would not be readily perceived by decedent, who plaintiff's proofs showed was an experienced forklift operator, familiar with the machine's intrinsic characteristics.[6]

We are no longer on the frontier of products liability litigation.[7] The time has approached when we must begin to refine the role of the judiciary in such controversies with deference to its limitations and cognizance of the importance of participation by our coordinate governmental branches. This case has presented such an opportunity. Because of the result reached, we need not consider the other issues raised by plaintiff.

Affirmed. Costs to defendant.

J. H. Gillis, J., concurred.

N. J. Kaufman, J. *(concurring).* I concur sepa-

---

[6] Decedent's foreman testified that decedent had been operating forklifts for at least three years. He also testified that every forklift operator, including decedent, had to pass a qualifications examination before being permitted to operate a forklift. This was the only position requiring such an examination.

The safety director for decedent's employer testified that a similar accident happened about a year before this occurrence. As a consequence, pertinent job safety manuals were reviewed with all operators to emphasize the need for caution in operating the forklifts.

Plaintiff testified that decedent had been operating forklifts for approximately four to five years.

[7] Significant steps were taken to develop this aspect of our law 62 years ago in the case of *MacPherson v Buick Motor Co,* 217 NY 382; 111 NE 1050 (1916).

rately in the well-written opinion by my colleague based on the following language from *Elsasser v American Motors Corp,* 81 Mich App 379, 384–385; 265 NW2d 339 (1978).

"A product liability suit based on an implied warranty theory requires proof of a defect in manufacturing or design and injury caused by or resulting from the defect. *Piercefield v Remington Arms Co,* 375 Mich 85, 96; 133 NW2d 129 (1965). Under the implied warranty theory a defect is established by proof that the product is not reasonably fit for its intended, anticipated or reasonably foreseeable use. *Dooms v Stewart Bolling & Co,* 68 Mich App 5, 14; 241 NW2d 738 (1976), *lv den* 397 Mich 862 (1976)."

In this case, a careful reading of the transcript reveals that there was no testimony whatsoever that the injury was caused by any defective product.